**Donald Earl MIKESELL, Petitioner–Appellant,**

v.

**Robert CONLEY, Warden, Luther Luckett Correctional Complex, Respondent–Appellee.**

No. 00–5845.

United States Court of Appeals, Sixth Circuit.

Oct. 21, 2002.

498

Before SUHRHEINRICH, SILER, and BATCHELDER, Circuit Judges.

BATCHELDER, Circuit Judge.

The Petitioner–Appellant, Donald Earl Mikesell, appeals the district court's order dismissing his petition for federal habeas relief. Mikesell claims that the district court should have held that the Supreme Court of Kentucky violated the United States Constitution in any one of four ways when it affirmed his conviction for a sexual performance with a minor: that the trial court's decision to admit evidence of events surrounding the taking of the photograph that formed the basis of his conviction resulted in a fundamentally unfair trial; that the photograph was protected expression under the First Amendment; that the admission of testimony based on redacted portions of a co-defendant's statement violated his Sixth Amendment right to be confronted with the witnesses against him; and that in light of the totality of the circumstances, the cumulative effect of the constitutional errors resulted in a fundamentally unfair trial. Finding no merit to these claims, we affirm the judgment of the district court.

### Factual and Procedural Background

Mikesell met the 13–year–old female "J.N." in September of 1995, at the Richmond, Kentucky, home of one Virgie Dillingham. Dillingham worked with J.N.'s mother, and J.N. would stay at Dillingham's house after school. J.N.'s mother did not live in Richmond, but she was expecting to move there soon and she had placed J.N., a freshman, in high school there. At Dillingham's house, J.N. became friends with Dillingham's sister Carolyn Minter, who lived with Dillingham, and Minter became J.N.'s close confidante. It was through Minter that J.N. met Mikesell. Minter and Mikesell had a long-standing extra-marital sexual relationship, and Mikesell had often supported Minter.

According to J.N.'s testimony at trial, she and Mikesell met three times, and on each occasion he molested her. The first of these meetings occurred at Dillingham's house, with J.N., Mikesell, and Minter present. Mikesell came in, talked, and then went into the bathroom. Minter told J.N. to go into the bathroom and take her clothes off, and J.N. obeyed—taking off her clothes while Mikesell watched. Mikesell had her sit, naked, on the dryer, and while he reassured her that she should not be nervous he fondled her breasts and vagina. This ended after five or ten minutes when Minter knocked on the door and told Mikesell to hurry up. As J.N. put her clothes back on, Minter went outside and talked with Mikesell next to his truck. Minter returned a few minutes later with $100, telling J.N. that some of it was hers. J.N. told Minter to hold her share for her.

A week or two later, the three again met at Dillingham's house. This time Mikesell brought white lace lingerie for J.N. Minter told J.N. to put on the lingerie; J.N. did so, as Mikesell watched, and then she obeyed Minter's instruction to go to a bedroom upstairs. Mikesell followed J.N. to the bedroom, where he had her take off her lingerie and lie down on the bed. He lay down next to her and fondled her as before, telling her not to be nervous because she was so pretty. This incident ended as the previous one had: Minter knocked on the door, Mikesell went outside with Minter, and Minter came back with money for both of them, but kept J.N.'s share.

Minter took J.N. to Mikesell's house on the third occasion, on September 29, 1995. This time Minter gave J.N. wine coolers and cigarettes, and Mikesell again gave Minter lingerie for J.N., which J.N. put on as Mikesell watched. After Minter had left the room, J.N. took off the lingerie and Mikesell took off his clothes; they lay down on the floor together and Mikesell fondled her and asked her "when she would be ready for it to go further." When J.N. replied that she was not ready, Mikesell reassured her that she would get used to it. Minter came back into the room after a while and performed oral sex on Mikesell; J.N. remained in the room but did not watch, though they had invited her to. Later, Mikesell brought out a Polaroid camera and had Minter take a full frontal photograph of J.N. and him standing together, side by side, touching. The photograph showed each from the knees up—both were fully naked, Mikesell had his arm around J.N.'s waist, and the genitals of each were fully visible. Mikesell took another picture of J.N. and Minter sitting leaning against one another shoulder-to-shoulder, Minter naked to the waist and J.N. entirely unclothed. Minter told J.N. not to worry about the pictures because Mikesell would burn them. As before, Mikesell and Minter went outside, and then Minter returned with money. This was the last meeting between J.N. and Mikesell. J.N.'s mother learned of the incident several months later, when J.N.'s best friend broke a promise never to tell anyone else about it.

In Mikesell's version of the facts, he and J.N. had met together only twice—the first time with J.N.'s mother present, and the second time at his house on September 29, 1995. On the second occasion two photographs were taken: one of J.N. and him, and one of Minter and him. No one was nude in either. After the pictures were taken he burned them in a trash barrel on his property, so his wife would not find out.

In December of 1996, a Kentucky grand jury returned an indictment against Mikesell and Minter, charging that they had induced J.N. to engage in a "sexual performance." The statute Mikesell was

charged with violating establishes that "[a] person is guilty of the use of a minor in a sexual performance if he ... induces a minor to engage in a sexual performance." KY. REV. STAT. ANN. § 531.310(1). The term "sexual performance" means "any performance or part thereof which includes sexual conduct by a minor"; "performance" includes "any ... photograph"; and "sexual conduct by a minor" means (1) various overt sexual activities, (2) "willful or intentional exhibition of the genitals," and (3) "[t]he exposure, in an obscene manner, of the unclothed or apparently unclothed human ... female genitals, pubic area or buttocks, or the female breast ... in any resulting ... photograph ...," exclusive of exposure portrayed in matter of a private, family nature not intended for distribution outside the family." *Id.* § 531.300. The word "obscene" as used in the statute "means the predominate appeal of the matter taken as a whole is to a prurient interest in sexual conduct involving minors." *Id.*

Both Mikesell and Minter pleaded not guilty, and the case proceeded to a joint trial. Shortly before trial Mikesell handed over to the state a partially burned photograph he said he had found in his trash barrel, of an unidentifiable person standing next to J.N. In this photograph J.N. was wearing an opaque negligee, through which her "private parts" were not visible. At trial Mikesell testified that the person standing next to J.N. had been he, and that this was the only picture taken of him and her.

When J.N. was asked about this photograph at trial she said that she did not remember it being taken, but she knew that the picture of them fully naked had been taken first. The prosecutor then asked her how could she be sure that she and Mikesell were naked in the incriminating photograph, if she had forgotten that

this picture had been taken. Her reply: "I couldn't forget the first picture." The prosecutor pressed her again, asking, "Are you certain about the first picture?" "Positive," was J.N.'s response.

The jury found Mikesell guilty and recommended the maximum sentence of twenty years, which he received. The photograph that was the basis of the offense was not introduced at trial, either because it had been destroyed or—as Mikesell maintains—because it never existed.

Mikesell appealed to the Supreme Court of Kentucky but the court affirmed his conviction, unanimously. On August 4, 1998, Mikesell filed a petition for federal habeas corpus review. A United States magistrate judge reviewed Mikesell's claims and recommended that Mikesell's petition be denied. The district court adopted the magistrate's opinion and denied the petition, and this appeal followed.

### Analysis

We review the district court's denial of the writ *de novo. Harris v. Stovall,* 212 F.3d 940, 941 (6th Cir.2000). Because Mikesell's habeas petition was filed after the Antiterrorism and Effective Death Penalty Act ("AEDPA") became effective on April 24, 1996, the provisions of that Act apply to his case. We review Mikesell's appeal from the state court's judgment under the standard established at 28 U.S.C. § 2254(d)(1), which allows federal courts to grant a writ for fully adjudicated state claims only where the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See also Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (interpreting this provision); *Bailey v. Mitchell,* 271 F.3d 652,

655–56 (6th Cir.2001) (summarizing the Supreme Court's instructions regarding how to interpret and apply § 2254(d)(1)). Our focus in this inquiry is consequently not on the broad question of whether the trial court erred—as if we were considering this case on direct review from district court—but rather on the limited question of whether in upholding Mikesell's conviction, the Supreme Court of Kentucky violated clearly established federal law as determined by the United States Supreme Court.

## I. Evidence of "Other Bad Acts"

Mikesell argues that by allowing J.N. to testify that on several occasions he had watched her undress and had fondled her (offenses for which he had not been charged), the judge allowed the jury to become unduly prejudiced against him. The judge had opted to allow this clearly damaging evidence on the basis of Kentucky Rule of Evidence 404(b), which provides that evidence of other crimes, wrongs, or acts may be admissible (1) "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," or (2) "[i]f so inextricably intertwined with other evidence essential to the case that separation of the two could not be accomplished without serious adverse effect on the offering party." The Supreme Court of Kentucky approved the trial judge's decision, under both 404(a) and (b), for two reasons: first, the similar circumstances of the incidents—the repeated fondlings through the agency of Minter, the repeated use of lingerie, the conversations between Minter and Mikesell outside after each incident, followed each time by an offer of money to J.N.—together "raise[d] a reasonable inference bearing on motive, opportunity, intent, and common plan or scheme"; and second, "[t]he evidence of the other sexual

contacts helped to establish that the photograph was obscene."

■ The constitutional question here is whether the Supreme Court of Kentucky should have found that introduction of this evidence made Mikesell's trial so fundamentally unfair as to deny him due process. *See Estelle v. McGuire*, 502 U.S. 62, 73, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir.2001); *see also Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) ("Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' ") (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)). We find that the evidence was constitutionally permissible: it was relevant for the reasons cited by Kentucky's high court, and there was nothing fundamentally unfair about the trial court's decision to admit it. The evidence was particularly relevant to show how Mikesell "induced" J.N. to do what she did—given that Kentucky's statute requires inducement. *See* KY. REV. STAT. ANN. § 531.310(1). In sum, we see no reason to conclude that the Supreme Court of Kentucky's approval of the 404(b) evidence was contrary to, or involved an unreasonable application of, federal law as established by the United States Supreme Court. *See also Seymour*, 224 F.3d at 552 (noting "the wide latitude afforded to states with regard to evidentiary matters under the Due Process Clause.")

## II. Whether the Photograph was Protected by the First Amendment

Under this heading Mikesell raises two objections, which we will discuss respec-

tively: first, that it was constitutional error to convict Mikesell based on a photograph that was only described but was not produced at trial, and second, that the photograph, as described, was constitutionally protected "mere nudity."

■ Mikesell's first objection poses the question of whether there existed at the time of his appeal any clearly established Supreme Court precedent indicating that for a conviction based on the content of a photograph to be constitutionally permissible, the jury must have been confronted with the actual picture. Though Mikesell cites in his favor several Supreme Court concurrences and dissents that tangentially support his proposition, these fall far short of establishing his proposed rule. *See, e.g., Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) ("I know it when I *see* it.") (Justice Stewart, concurring) (emphasis added). We conclude that the Supreme Court of Kentucky did not transgress clearly established United States Supreme Court precedent when it upheld Mikesell's conviction that was obtained on the basis of testimony alone.

We move on to Mikesell's second objection, regarding whether the photograph-as-described was protected by the First Amendment. At trial J.N. testified of the photograph that "he was standing right next to me with his arm around my waist," and that the photograph "showed everything on both of us. Our whole front side." Questioned further, she added that it depicted their bodies from the "knees up," including her "breasts" and "vaginal area," and his "pubic area."

Mikesell correctly observes that "mere nudity" is protected by the First Amendment—even where child pornography is involved. *See Erznoznik v. Jacksonville,* 422 U.S. 205, 213 n. 10, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) ("It is clear ... that under any test of obscenity as to minors not all nudity would be proscribed. Rather, to be obscene such expression must be, in some significant way, erotic.") (internal quotations omitted); *New York v. Ferber,* 458 U.S. 747, 765 n. 18, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) ("[N]udity, without more is protected expression[.]"). The Court discussed this requirement in *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990), in the course of considering whether an Ohio statute that prohibited possession of "nude" photographs of minors was overbroad. After noting that "depictions of nudity, without more, constitute protected expression," *id.* at 112, the Court concluded that the statute was not overbroad because the Ohio Supreme Court had construed it to prohibit only materials involving "a lewd exhibition or ... a graphic focus on the genitals," and the person depicted could be "neither the child nor the ward of the person charged," *id.* at 113. The Court concluded that these limitations were adequate to prevent convictions for "innocuous photographs of naked children." *Id.* at 114. In a footnote the Court suggested that an example of a constitutionally-protected innocuous photograph would be where "a parent gave a family friend a picture of the parent's infant taken while the infant was unclothed[.]" *Id.* at 114 n. 9.

Also useful in determining what is "mere nudity" are the Court's *reasons* for setting aside the normal obscenity rule and allowing states more freedom to prohibit "sexual performances" involving children (as in *Ferber*) and the possession of materials depicting children (as in *Osborne*): the Court recognized that states have a compelling interest in protecting children from exploitation. *See, e.g., Ferber,* 458 U.S. at 756–58 ("It is evident beyond the need for elaboration that a State's interest in 'safe-

guarding the physical and psychological well-being of a minor' is 'compelling.' ... The legislative judgment, as well as the judgment found in the relevant literature, is that the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child. That judgment, we think, easily passes muster under the First Amendment.") (internal footnote omitted); *Osborne,* 495 U.S. at 110 ("Given the importance of the State's interest in protecting the victims of child pornography, we cannot fault Ohio for attempting to stamp out this vice at all levels in the distribution chain.").

■ On the basis of *Ferber* and *Osborne,* then, we conclude that the relevant "clearly established Federal law, as determined by the Supreme Court of the United States" is that the First Amendment protects nudity that involves no exploitation of children—as, for example, where a parent innocuously photographs his or her naked infant—but that states may prohibit materials and conduct involving the exploitation of children—exemplified, for example, by photographs of children other than the defendant's child that depict lewd exhibitions or a graphic focus on the child's genitals. (Though the Court does not discuss it, since the evil that is to be prevented is exploitation, one would expect that the requirement of "lewdness" in a prohibited picture would vary according to the circumstances: in cases where nothing was known of what actually went on when the picture was taken, the picture itself would have to have a stronger suggestion of eroticism than it would in a case where the circumstances were known to have included exploitation.)

■ Turning to the present case, the question is whether the photograph of the middle-aged Mikesell, fully naked, standing with his arm around the 13–year-old J.N., also fully naked, was "mere nudity"— an innocuous photograph of an unclothed child that did not involve exploitation of the child. Stated thus, we think it evident that the photograph did not enjoy constitutional protection. The photograph even when considered alone was arguably not "mere nudity": though as described the photograph did not involve a graphic focus on the genitals, the fact that a naked older man had his arm around a barely-pubescent teenager clearly suggests that he was exploiting her sexually. When considered in light of the surrounding events as presented at trial, the suggestion becomes a certainty.

■ Mikesell, however, argues that it was and is constitutional error to consider anything except the photograph itself when determining whether "mere nudity" was involved—that is, that since he was convicted on the basis of the photograph, the First Amendment determination should not consider the testimony that he had molested J.N. immediately before the picture was taken as well as on two other occasions. We disagree. *Ferber* and *Osborne* establish that the state's compelling interest is in preventing exploitation, and the Court expressed no qualms about considering outside factors in determining whether a picture was innocuous. Even in *Osborne,* which concerned possession of materials rather than sexual performances, the Court allowed extraneous facts to enter the consideration: it approved the requirement that the photograph could not have been taken by the child's parent, and the Court's example of a photograph involving mere nudity added the narrative fact that the recipient was a family friend. And the Kentucky statute prohibiting "sexual performances" clearly invokes this compelling state interest, given that it penalizes those who "induce[ ] a minor to engage in a sexual performance," KY.

REV. STAT. ANN. § 531.310, as memorialized "in any *resulting* ... photograph[.]" *Id.* § 531.300(4)(d) (emphasis added). We conclude that the Supreme Court of Kentucky did not violate clearly established United States Supreme Court precedent when it considered Mikesell's surrounding conduct in making its obscenity determination, nor did that court err when it held that Mikesell's conviction thus considered did not violate the First Amendment.

## III. Co–Defendant Testimony and Right to Confrontation

Some additional facts are necessary to explain this claim. At trial there was a disagreement over how many pictures had been taken, and what the content of those pictures was. J.N. had testified that two pictures were taken at Mikesell's house on September 29, 1995—one of her with Mikesell's arm around her and both of them naked, and another of her and Minter. Mikesell also testified that two photographs had been taken—one of him with Minter (both clothed) and another of him standing by J.N. in an opaque negligee, which was the photograph he produced at trial. J.N., on cross examination, agreed that this picture had also been taken on that day. Thus J.N. and Mikesell agreed in their testimony on direct that only one picture had been taken of the two of them together, and—assuming that only one such picture had been taken—the dispute was over the content of that picture. Mikesell produced one picture of himself with J.N., and that picture was not obscene, so (he argued) he should be acquitted.

The prosecution attacked this argument via a statement Minter had made to Detective Karen Covington. Though Minter did not testify at trial, Covington did, and in its direct examination of Covington the prosecution had her read portions of Minter's statement. Parts of the statement that referred to Mikesell had been redacted, since the hearsay statement was admitted for use against Minter. At the end of this reading, the prosecution asked Covington how many pictures Minter had mentioned, and how many pictures Minter had said included J.N.—a question requiring Covington to summarize from redacted portions of Minter's statement, since the answer was not evident from what Covington had read aloud. Minter, Covington replied, had said that *three* pictures had been taken, two of which included J.N. Later in the trial the prosecution made the most of this conclusion in its case against Mikesell—using it to corroborate J.N.'s testimony and to claim that Mikesell had lied because his testimony had contradicted that of Covington and Minter. Mikesell contended then, as he does now, that Minter's indirectly-admitted statements violated his Sixth Amendment right to confront the witnesses against him—a right the Supreme Court has upheld in the context of non-testifying co-defendants in a series of cases beginning with *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

In *Bruton* the confessions of Bruton's co-defendant were introduced via the testimony of an inspector to whom the co-defendant had made his confession. The inspector's testimony directly named and incriminated Bruton. Though the trial court had given a corrective instruction to the jury that it should not consider the co-defendant's testimony against Bruton, the Supreme Court found this insufficient and held instead that "a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh,* 481

U.S. 200, 201–02, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (summarizing *Bruton*'s holding).

Next, in *Richardson* the Court considered "whether *Bruton* requires the same result when the codefendant's confession is redacted to omit any reference to the defendant, but the defendant is nonetheless linked to the confession by evidence properly admitted against him at trial." *Id.* at 202. The Court held that the admission of a non-testifying co-defendant's confession does not violate the other defendant's confrontation rights if (1) the confession was redacted to eliminate the other defendant's name and any reference to the other defendant, *id.* at 209; (2) the confession was not incriminating on its face, and became so only when linked with later evidence properly introduced at trial, *id.* at 208; and (3) the jury was instructed not to use the confession in any way against the other defendant, *id.* at 206–07.

Mikesell argues that in his case his co-defendant's testimony—which admittedly did not mention his name, or directly incriminate him—nevertheless was linked to him so strongly and in such an incriminating manner by the prosecutor's later comments that *Richardson*'s protective rule for "indirectly incriminating" statements should not apply. Alternately, he argues that the later linkage brought his case within the later case of *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), which held—in a factual situation similar to that in *Bruton*—that it was not sufficient merely to replace the defendant's name with the word "delete" or "deletion" when reading the co-defendant's statement to the jury. *Id.* at 192. We find these objections without merit: the statement, even when linked, was incriminating only in a very indirect sense, and it mostly served to bolster J.N.'s version of the story. At any rate, there is no clearly established Supreme Court precedent indicating that a non-facially-incriminating co-defendant statement can be linked up so strongly as to violate *Richardson,* or that the later linkage can be so overt as to amount to the kind of practice forbidden in *Gray.*

■■ There is a real problem lurking here, nevertheless—one that removes the case from the permissible practice described in *Richardson* and brings it within the realm of *Bruton:* the trial court did not instruct the jury that it was to consider Minter's statement only against her, and not against Mikesell. That this is an essential element of the Court's holding in *Richardson* is undeniable. *See, e.g., Richardson,* 481 U.S. at 211 ("We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession *with a proper limiting instruction* when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.") (emphasis added). Mikesell's counsel, however, requested neither such an instruction, nor objected to its omission; neither did his counsel raise the issue on direct appeal or in Mikesell's habeas petition.

A petitioner procedurally defaults when he fails to exhaust all available state remedies (here, by failing to object or to ask the state high court to rule on the question), and the state court to which he would be required to petition would now find the claim procedurally barred. *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In Mikesell's case, Kentucky Rule of Criminal Procedure 11.42 allows a party to directly appeal and bring one collateral attack, after which all claims not brought on the direct appeal or in that collateral challenge are generally defaulted. *See* KY. R. CRIM. P. 11.42(3) ("The motion shall state

all grounds for holding the sentence invalid of which the movant has knowledge. Final disposition of the motion shall conclude all issues that could reasonably have been presented in the same proceeding."); *Stamps v. Rees,* 834 F.2d 1269, 1274 (6th Cir.1987). The consequence of procedural default is that the petitioner is deemed to have forfeited his habeas claim. We conclude that Mikesell has forfeited this ground of his *Bruton* claim.

■ Even without the procedural default, however, we find that the error would not have resulted in "actual prejudice"—that is, the error had no "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Nevers v. Killinger,* 169 F.3d 352, 370–71 (6th Cir.1999) (finding that the standard articulated in *Brecht* applies to constitutional errors in post-AEDPA habeas cases). The statement here was only Minter's conclusion regarding how many pictures were taken on the date in question; it did not mention Mikesell or even mention that there were others present besides himself and J.N., and at most it corroborated J.N.'s testimony. The statement did not actually implicate Mikesell at all; it simply gave the jury one more piece of evidence that there were three pictures, not only the one—which was not illegal in its content—that Mikesell maintained was taken. And the statement did not point to Mikesell as being involved; only Mikesell and J.N. did that.

We do not consider the finding of actual prejudice in *Bulls v. Jones,* 274 F.3d 329 (6th Cir.2001) to be dispositive here. *Bulls* is wholly distinguishable from this case; in *Bulls* neither defendant testified and the prosecution presented via a police officer the statements of both the defendant and the co-defendant, without redacting any names. Both statements directly incriminated Bulls, and the co-defendant's statement explicitly imputed to Bulls the mental state requisite to the offense, something of which there was virtually no other evidence. That error was much more egregious and prejudicial than in the error here.

## IV. Cumulative Error

■ Finally, Mikesell argues that "[w]hile any one of the grounds set forth in this Brief warrants habeas corpus relief, even if each alone did not justify relief, the totality of the circumstances requires it." Though Mikesell raised before the Supreme Court of Kentucky the various errors that he now argues amount to a cumulatively unfair trial, he did not raise to that court this separate claim that those errors together require reversal, nor does he demonstrate either cause or prejudice with regard to his failure to do so. Consequently we find that this claim, too, is procedurally defaulted. *See also Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.")

## Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court dismissing Mikesell's appeal.