NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0133n.06
Filed: February 17, 2009

No. 07-1405

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARIO PETERSON, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| MILLICENT WARREN, | ) | |
| | ) | **O P I N I O N** |
| Respondent-Appellee. | ) | |
| | ) | |

Before: MERRITT, ROGERS, and WHITE, Circuit Judges.

**WHITE, Circuit Judge.** Petitioner-Appellant Mario Peterson appeals *pro se* the denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Peterson was tried in a Michigan state court and convicted of second-degree murder under an aiding-and-abetting theory. The Michigan Court of Appeals affirmed his conviction and the Supreme Court of Michigan denied leave to appeal. The federal district court denied Peterson's habeas petition, and a certificate of appealability was issued only as to Peterson's claim that the admission of his non-testifying co-defendant's statement at their joint trial violated Peterson's Sixth Amendment right to confront the witnesses against him and was not harmless error. For the following reasons, we **AFFIRM**.

## I. BACKGROUND

A.      Facts

This court relies on the facts as found by the state appellate court on direct review. *See, e.g.,* *Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 770 (6th Cir. 2008); *see also* 28 U.S.C. § 2254(e)(1). The facts and procedural history as stated by the Michigan Court of Appeals are as follows:

Defendant's conviction arises from his involvement in the drive-by shooting of LaWranza Robertson. Codefendant William Martin shot Robertson from the rear side window of a passing car in which defendant was the driver, and another codefendant, Shawn Lundy, was a front-seat passenger.

The evidence against defendant consisted primarily of the testimony of Steven Brown, who was with Robertson, and defendant's statement to the police. Brown testified that he was walking Robertson home from a barbecue shortly after midnight on June 6, 1999, when a station wagon approached and slowed down at the intersection of Holmur and Chalfonte in Detroit. Although he did not recognize the car, Brown recognized the occupants as defendant, Martin and Lundy. As the car slowed down, Martin leaned out the back window and started shooting with a black handgun. Robertson was struck in the chest and died.

The defense theory was, in essence, that this was a tough neighborhood, that Brown and his associates wanted to control drug sales in the neighborhood, that Brown shot at the station wagon as part of a turf battle, and that Martin shot back in self-defense (mistakenly hitting Robertson). Brown denied being armed. Although a witness heard two sets of gunfire, all bullet shells found at the scene were fired from Martin's weapon.

Defendant, Lundy, and Martin were tried jointly—defendant and Lundy before one jury, and Martin before a separate jury. Defendant's jury heard custodial statements given by Lundy as well as himself, but was instructed that Lundy's statement could not be considered in determining his guilt, nor could his statement be considered in determining Lundy's guilt. In his statement, defendant said he, his brother and Martin were driving around earlier in the evening and heard approximately twenty-two gunshots. They went back to defendant's house; Martin left and returned later in a station wagon. Martin asked defendant and Lundy if they wanted to ride around, and they got in with him. When they were riding around, "Martin said he was wondering who was shooting at us," but defendant did not know Martin had a gun until they were riding down Holmur. Martin had a black automatic pistol and fired seven or eight shots without saying anything. Defendant said he asked Martin who he was shooting at because he did not see anyone on the street. Defendant told the police he had a dispute with Patrick Bryant about whether he (defendant) was selling drugs in Bryant's territory (the shooting occurred near

Bryant's home). Also, a month earlier, Bryant had "sucker-punched" defendant, but defendant said he had not seen Bryant since that time.

The prosecutor generally characterized the shooting as a "plan" to "hunt" down Bryant or his associates. Defendant was asked about a plan, and responded (in his statement) as follows:

> Q. Did you, Shawn and Martin plan to hunt down Patrick, Dwayne, Steve and little Mo?
> A. Martin said if that's who was outside, that's who we were going to get.
>
> * * *
>
> Q. Did you, Martin, and Shawn make plans before the shooting?
> A. We said that we were going to ride around and look for whoever was outside.

. . .

The trial court allowed [defendant's and Lundy's] statements into evidence, but instructed the jury to consider Lundy's statement only when deciding Lundy's case. Lundy did not testify and, therefore, was not subject to cross-examination regarding his statement.

The prosecutor's closing argument was divided into two parts, one addressing the case against Lundy and one addressing the case against defendant. The Lundy statement was cited by name only during the Lundy portion of closing. Nonetheless, the prosecutor referred to some evidence established by the Lundy statement when discussing the evidence against defendant. Notably, the prosecutor twice referred to an earlier shooting "at" defendant, which came from Lundy's statement, although arguably it also was established by defendant's statement. No objection was raised.

*People v. Peterson*, 2002 WL 31934114, at *1-2 (Mich. Ct. App. Nov. 19, 2002) (per curiam).

"Following a jury trial, defendant was convicted of second-degree murder, M.C.L. § 750.317, under an aiding and abetting theory." *Id.* at *1.

## B. State Proceedings

Peterson appealed his conviction to the Michigan Court of Appeals, raising ten issues in his principal brief and a supplemental brief filed *in propria persona*. One of Peterson's arguments was

3

that the admission of Lundy's statement at the joint trial denied Peterson his rights under the Confrontation Clause of the Sixth Amendment.[1] Rejecting the prosecutor's argument that Lundy's statement was entirely exculpatory and thus *Bruton v. United States*, 391 U.S. 123 (1968), is inapplicable, the Michigan Court of Appeals concluded that Lundy's statement inculpated Peterson by indicating that he shared a plan to seek revenge for an earlier shooting. *Peterson*, 2002 WL 31934114, at *2. The court then analyzed the case under *Cruz v New York*, 481 U.S. 186 (1987), and concluded that a Confrontation Clause violation occurred even though the trial court gave a limiting instruction as to the use of Lundy's statement and Peterson's own confession was introduced against him. *Peterson*, 2002 WL 31934114, at *2-3.

The court concluded, however, that the error was harmless. It rejected Peterson's argument that Lundy's statement provided the "only evidence that . . . there was a revenge motive based on an earlier shooting." *Id.* at *3. The court observed that although "Lundy's statement directly established a motive based on Patrick's earlier shooting at defendant," Peterson's own statement "admitted that he heard twenty-two shots when driving around with Martin earlier and that when driving around in the station wagon 'Martin said he was wondering who was shooting at us.'" *Id.* at *4. The court further recognized that Peterson "also stated that he had a 'beef' with Bryant based

---

[1] Peterson's other arguments were that (a) the circuit court should have declared a mistrial due to alleged juror misconduct, (b) Peterson should have been tried separately from Lundy, (c) Peterson's statement to the police was involuntary and should have been suppressed, (d) the evidence of shared intent and cause of death was insufficient, (e) the cumulative effect of multiple errors deprived him of a fair trial, (f) the court erred when it vacated his sentence for murder and imposed a new sentence under Michigan's habitual offender statute, (g) he was entitled to sentence credit for time served, (h) he was entitled to a new hearing pursuant to *People v. Walker*, 132 N.W.2d 87 (Mich. 1965), so that he could testify that his statement was coerced, and (i) the court's ruling that the prosecutor could inquire as to the truthfulness of Peterson's statement to police "chilled" his right to testify at his *Walker* hearing. *See Peterson*, 2002 WL 31934114, at *2-8.

4

on an incident a month earlier in which Bryant 'sucker-punched' him at a store." *Id.* The court concluded that "[w]hile Lundy's statement makes the dispute seem more immediate and clear, . . . those differences are merely a matter of degree." *Id.*

The court similarly rejected Peterson's argument that Lundy's statement was the only evidence that "there was a 'plan' to look for Bryant or his associates." *Id.* at *3. The court noted that Peterson also spoke about a plan in his statement:

> Q. Did you, Shawn and Martin plan to hunt down Patrick, Dwayne, Steve and little Mo?
> A. Martin said if that's who was outside, that's who we were going to get.
> * * *
> Q. Did you, Martin, and Shawn make plans before the shooting?
> A. We said that we were going to ride around and look for whoever was outside.

*Id.* This, the court observed, was "similar to Lundy's own account" that "Ken said we were going to ride until they saw Patrick, Dwayne, Steve or Little Mo" and that "[t]here was a plan. Ken was to be let out of the vehicle once he saw any of them . . . ." *Id.*

Peterson's argument that Lundy's statement was the only evidence that "the station wagon was a 'crack rental,' which buttressed the prosecutor's argument that the three defendants did not drive their own cars so they could have the element of surprise and facilitate an anonymous getaway," *id.* at *3, was similarly rejected by the appeals court. The court noted that Peterson's statement "said that the station wagon 'probably was a base rental'" and concluded that because "[t]hose references are substantially identical, . . . there was no harm." *Id.* at *4.

The court also rejected Peterson's argument that "Lundy's statement 'bolstered' details of Steven Brown's testimony that a station wagon was used, that defendant drove, that Lundy rode in front, and that Martin shot from the back seat." *Id.* at *3. The court found Lundy's statement in this

regard to be "clearly harmless," as Brown's testimony on these points was undisputed and Peterson's own statement confirms these details. *Id.*

Finally, the court rejected Peterson's argument that the use of Lundy's statement was not harmless because the prosecution relied on it in its closing argument. *Id.* The court recognized that the prosecutor "indeed relied on statements about the earlier shooting in closing argument," in which the prosecution argued that Peterson agreed to drive the car "after being shot at" and that there is "no question of Mr. Peterson's intent when he agreed to drive that car was to get back because *he was just fired upon* 22 times. He was going to go back and do the same thing. They had a plan, and that's what they did." *Id.* at *4 (emphasis added by appeals court). However, the court also recognized that Peterson's own statement

> indicated that he heard about twenty-two shots while riding around with his brother and Martin around 9:30 pm. Defendant did not directly state that he thought he had been fired upon, as Lundy stated; however, defendant did state that Martin wondered who was shooting at "*us*." Further, defendant's statement indicated that he had a "beef" with Bryant because of the "sucker-punch" a month earlier[.]

*Id.* The court thus

> conclude[d] that the prosecutor's argument was not improper because it was based on defendant's own statement and the legitimate inference that defendant believed himself to be a target of the earlier gunshots. Even though Lundy's statement makes the dispute sound more immediate, that distinction is not sufficiently material to require reversal. The prosecutor's reference to a "plan" is supported by defendant's own statement, which referred to a plan to drive around until they saw Bryant or his associates, so the prosecutor's use of the word "plan" is harmless.

*Id.* The court also noted that Peterson did not object to the prosecutor's closing argument and that "defendant's counsel himself expressly referred to Lundy's statement in closing arguments to buttress his argument that there was no plan to kill anybody." *Id.*

6

After disposing of Peterson's remaining issues on appeal, the court affirmed Peterson's conviction and sentence—though it remanded so that the judgment of sentence could be corrected to reflect credit for time served. *Id.* at \*1, 7-8. The Supreme Court of Michigan denied Peterson's delayed application for leave to appeal the ruling of the Court of Appeals, though three Justices would have "order[ed] the prosecutor to show cause why the defendant's conviction should not be reversed on the ground that the statement of a non-testifying co-defendant was present before the jury." *People v. Peterson*, 664 N.W.2d 214 (Mich. 2003) (Table).

## C.    Federal Habeas Proceedings

On June 22, 2004, Peterson filed *pro se* a petition for a writ of habeas corpus in federal district court. The court subsequently permitted Peterson to file an amended habeas petition which contained only claims he had already exhausted in the Michigan courts. *See Peterson v. Warren*, No. Civ. 04-72299-DT, 2006 WL 36756 (E.D. Mich. Jan. 5, 2006). This amended petition asserted six grounds for relief: (a) petitioner's "conviction [was] obtained by use of coerced confession," (b) petitioner's "conviction [was] obtained by use of evidence gained pursuant to an unconstitutional search and seizure, and unlawful arrest," (c) "denial of Sixth Amendment and state constitutional rights to confront the witness against me," (d) "juror misconduct," (e) "sufficiency of the evidence," and (f) "habitual offender sentence." J.A. 77 (Habeas Pet. Attach. Sheet) (capitalization altered; minor spelling errors corrected).

The district court rejected all six arguments and denied Peterson's habeas petition. *Peterson v. Warren*, No. 04-CV-72299-DT, 2007 WL 496683 (E.D. Mich. Feb. 13, 2007). Regarding Peterson's Sixth Amendment claim, the district court noted that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a

7

reasonable doubt." *Id.* at *6 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967) (quotation marks omitted)). The district court recognized that "[w]hen a state court addresses a harmless-error claim on direct review, the clearly established federal law that it must apply is the *Chapman* standard," *id.* (quoting *Eddleman v. McKee*, 471 F.3d 576, 582 (6th Cir. 2006) (quotation marks omitted)), and followed this circuit's then-current precedent that the plain language of the Antiterrorism and Effective Death Penalty Act (AEDPA) "requires a federal court to deny a habeas petition unless a state court's determination of harmless error was contrary to, or an unreasonable application of, the principle that an error must be harmless beyond a reasonable doubt." *Id.* (citing *Eddleman*, 471 F.3d at 582).

The district court "conclude[d] that the Michigan Court of Appeals' conclusion that admission of Lundy's statement was harmless error beyond a reasonable doubt was a reasonable application of the *Chapman* standard." *Id.* The court ruled that any error in admitting Lundy's statement was harmless "in light of the fact that petitioner confessed to a full participation as an aider and abettor to the murder." *Id.* Peterson's statement, as well as Brown's testimony that Peterson was driving and that the car slowed down at the intersection prior to the shooting (which supports an inference that Peterson slowed the car down to enable Martin to shoot at Brown), "provided compelling evidence that petitioner aided and abetted in the murder of the victim." *Id.* at *6-7. The court thus concluded that Lundy's statement was "merely cumulative," that its admission was harmless, and that, "[a]t a minimum, this Court cannot state that 'the "minds of an average jury"' would have found the prosecution's case against petitioner '"significantly less persuasive"' had the incriminating portion of the co-defendant's statement been excluded." *Id.* at *7 (quoting *Stanford v. Parker*, 266 F.3d 442, 456 (6th Cir. 2001)).

8

Petitioner moved for a certificate of appealability on his Fifth and Sixth Amendment claims. The district court declined to issue a certificate of appealability as to the former, but granted a certificate of appealability as to the latter. We denied Peterson's subsequent application for an expanded certificate of appealability that would include his Fifth Amendment claim, observing that he failed to establish that his confession was involuntary and the district court's decision is not debatable amongst jurists of reason.[2] Thus, only petitioner's Sixth Amendment claim is now before this court.

## II. DISCUSSION

This court reviews de novo a district court's denial of a habeas petition. *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006). Factual issues determined by the state court "shall be presumed correct" unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"Confrontation Clause errors are subject to harmless-error analysis." *Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir. 2007). Peterson maintains that the Michigan Court of Appeals applied the wrong legal standard when it decided that the admission of Lundy's statement was harmless error. He argues that the Michigan court should have applied the test for harmless error found in *Chapman v. California*, 386 U.S. at 24, which requires the reviewing court, in order to hold that a constitutional error is harmless, "be able to declare a belief that it was harmless beyond a reasonable doubt." Instead, Peterson contends, the court applied the harmlessness test from *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), which states that the reviewing court should determine that an error is harmless unless the error "had substantial and injurious effect or influence in determining

---

[2]Accordingly, Peterson's arguments on appeal that his statement to the police was not voluntary are of no moment and we do not address them.

the jury's verdict." According to Peterson, "[a]pplying *Brecht* for harmlessness is both 'contrary to' and an 'unreasonable application' of Supreme Court precedent. . . . The Michigan Court of Appeals went beyond a mere impact of the *Bruton* violation and searched for extended prejudice which shows they applied *Brecht* instead of *Chapman*."

The *Chapman* test for harmlessness is to be used on direct review, while the *Brecht* test is to be used on collateral review. *Wilson v. Mitchell*, 498 F.3d 491, 502 (6th Cir. 2007), *cert. denied*, 129 S. Ct. 172 (2008). Thus, Peterson is correct that the *Chapman* standard was the proper test for the Michigan Court of Appeals to employ. However, it appears that the Michigan court employed the *Chapman* standard. Although the court neither cited *Chapman* by name nor explicitly invoked *Chapman*'s "beyond a reasonable doubt" language in its discussion of the Confrontation Clause error, it discussed *Cruz*, *supra*, in connection with both the substantive error and the determination of harmlessness, and referred to the harmless error analysis under *Harrington v. California*, 395 U.S. 250 (1969), as referred to in *Cruz*. *Peterson*, 2002 WL 31934114, at *3. In *Harrington*, the Supreme Court explicitly "reaffirm[ed]" the *Chapman* test and employed it to determine whether a *Bruton* Confrontation Clause violation constituted harmless error. *Harrington*, 395 U.S. at 253-54. The Michigan Court of Appeals' repeated references to *Cruz*, including *Cruz*'s citation to *Harrington*, make clear that the court applied the proper standard in reaching its harmless error determination. Nowhere does the court's analysis suggest that it employed any standard other than the *Chapman* standard.

In any event, federal courts sitting in habeas corpus review of a state court's finding of harmlessness employ the *Brecht* standard when determining whether a violation of the Confrontation Clause was harmless error. The district court below did not apply *Brecht* because it was following

10

this court's then-controlling precedent of *Eddleman v. McKee*, in which we held that "AEDPA replaced the *Brecht* standard with the standard of *Chapman* plus AEDPA deference when . . . a state court made a harmless-error determination." *Eddleman*, 471 F.3d at 583. The Supreme Court has since rejected *Eddleman*'s approach, holding instead that a federal court sitting in habeas "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 2328 (2007) (citations omitted); *see Vasquez*, 496 F.3d at 574-75 (explaining that *Fry* overruled *Eddleman* and that *Brecht* supplies the harmless-error standard on federal habeas review); *see also DeJesus v. Lafler*, 277 F. App'x 594, 595-96 (6th Cir.) (same), *cert. denied*, 129 S. Ct. 409 (2008); *Wilson*, 498 F.3d at 502-03 (same). Therefore, we must determine whether the Sixth Amendment violation that occurred at Peterson's trial "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).[3] "[W]hen a court is 'in virtual equipoise as to the harmlessness of the error' under the *Brecht* standard, the court should 'treat the error . . . as if it affected the verdict . . . .'" *Fry*, 127 S. Ct. at 2327 n.3 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)).

To determine the effect of the error under *Brecht*, we consider both the impact of the improperly admitted evidence and the overall weight of the evidence presented at trial. *See Brecht*,

---

[3]Although the district court did not analyze the harmless-error issue under *Brecht*, we are mindful that the *Brecht* test "subsumes" the AEDPA/*Chapman* standard. *Fry*, 127 S. Ct. at 2327; *see also Wilson*, 498 F.3d at 503 (observing that the *Brecht* test is "stricter (i.e., tougher on the petitioner) than AEDPA/*Chapman*").

11

507 U.S. at 639. As observed by the Michigan Court of Appeals, although Lundy's testimony does

supply additional evidence, that evidence is largely "cumulative" of Peterson's inculpatory statement[4]

and Brown's testimony. We conclude, in light of the weight of the other evidence of Peterson's guilt

and the cumulative nature of Lundy's statement, that the admission of Lundy's statement was

harmless error—that it did not have "substantial and injurious effect or influence in determining the

jury's verdict."

In his custodial statement, Peterson essentially confessed to aiding and abetting the murder

of Robertson. *See Peterson*, 2002 WL 31934114, at *1-2 (describing Peterson's custodial statement);

*id.* at *2-4 (analyzing the effect of Peterson's "confession").[5] Peterson argues that he never confessed

to the crime of murder—that, "[a]t best," his statement "could be construed as an aider [and] abettor,"

and that the court "transformed an aider-abettor statement into a full confession on murder." He

---

[4]Notwithstanding the danger that a non-testifying co-defendant's statement might inculpate the defendant by underscoring the reliability of the defendant's own inculpatory statements, a defendant's confession may be considered in determining whether a *Bruton* violation was harmless. *Cruz*, 481 U.S. at 193-94; *Stanford v. Parker*, 266 F.3d 442, 456 (6th Cir. 2001) ("An erroneous admission of a non-testifying co-defendant's confession can constitute harmless error where the defendant claiming a *Bruton* violation confessed to full participation in the crimes.").

[5]In its examination of the sufficiency of the evidence of Peterson's conviction of aiding and abetting murder, the Court of Appeals applied the elements as stated in *People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999). *See Peterson*, 2002 WL 31934114, at *6. *Carines* explains that
> [t]o support a finding that a defendant aided and abetted a crime, the prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. An aider and abettor's state of mind may be inferred from all the facts and circumstances. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime.
*Carines*, 597 N.W.2d at 135 (citation and quotation marks omitted).

contends this is significant because "[t]he crimes are different and fall under different statutes." Peterson is mistaken. Michigan's aiding and abetting statute provides that "[e]very person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." Mich. Comp. Laws § 767.39. Aiding and abetting "is not a separate substantive offense," but rather "is simply a theory of prosecution that permits the imposition of vicarious liability for accomplices." *People v. Robinson*, 715 N.W.2d 44, 47 (Mich. 2006) (footnote and internal quotation marks omitted).

Peterson argues that his statements to police that, as the Michigan Court of Appeals put it, "he asked Martin who he was shooting at" and "did not see anyone on the street," *Peterson*, 2002 WL 31934114, at *1, show that he did not have the requisite intent. However, the Court of Appeals characterized Peterson's statements as meaning that he "asked Martin who he was shooting at *because* he did not see anyone on the street." *Peterson*, 2002 WL 31934114, at *1 (emphasis added); *see also id.* at *6 ("After the shooting, defendant did not merely ask why Martin had shot his gun. Instead, he asked why Martin shot *because he (defendant) didn't see anyone on the street*. This is consistent with the theory that they were hunting for someone.") (emphasis in the original). Moreover, this statement creates no doubt about Peterson's intent when considered in the context of Peterson's damning statements to police when asked about a "plan":

> Q. Did you, Shawn and Martin plan to hunt down Patrick, Dwayne, Steve and little Mo?
> A. Martin said if that's who was outside, that's who we were going to *get*.
> * * *
> Q. Did you, Martin, and Shawn make plans before the shooting?
> A. We said that we were going to ride around and look for whoever was outside.

13

*Id.* at *4 (emphasis added).

Peterson also contests the Michigan Court of Appeals's finding that "[t]he evidence also indicated that defendant slowed down at the intersection, thereby supporting an inference that he did this to enable Martin to shoot." *Id.* at *6. This finding was apparently based on Steven Brown's testimony that the car used in the shooting approached and slowed down at the intersection, and that, as it slowed down, Martin leaned out the back window and started shooting. *See id.* at *1. Peterson says he "was approaching a stop sign," which, he argues, "contradicts slowing down to shoot Bryant." However, a state court's factual finding is, under AEDPA, "presumed correct" unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). There is no "clear and convincing evidence" to establish that Peterson only slowed the car to comply with a stop sign and did not slow down "to enable Martin to shoot."[6]

Brown's testimony, which largely corroborates Peterson's own statement and provides evidence of Peterson's intent, also supports the conclusion that the violation of Peterson's Sixth Amendment rights under Bruton was harmless. *See Stanford*, 266 F.3d at 457. Brown identified the car used as a station wagon and noted that the car pulled up fast and then slowed down as it approached the intersection. Brown recognized Peterson and stated that Peterson and Bryant had previously fought. Brown also noted that Bryant lived near where the shooting occurred. Based on this testimony, as well as Peterson's own statements about the plan and the fact that "defendant's counsel himself expressly referred to Lundy's statement in closing arguments to buttress his argument that there was no plan to kill anybody" (*Peterson,* 2002 WL 31934114, at *4), it cannot be said that

---

[6]Indeed, as the prosecution argued in its closing, the defense's contention that Peterson slowed the car to comply with a stop sign was arguably at odds with the defense's theory that the car was being fired upon and Martin shot back in self-defense. *See* J.A. 55-57.

14

the erroneous admission of Lundy's statement had "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 637.

### III.  CONCLUSION

The district court's denial of Peterson's petition for a writ of habeas corpus is **AFFIRMED**.