NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 07a0330n.06

Filed: May 11, 2007

No. 05-1902

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KELVIN McCRAY, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| LINDA METRISH, Warden, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

BEFORE:    BOGGS, Chief Judge; and DAUGHTREY and GIBBONS, Circuit Judges.

PER CURIAM.  Timothy Chaney was shot and killed outside 864 Philip Street in Detroit. Most witnesses agreed that the shots came from the passenger's side of a car stopped nearby. According to the state, Kelvin McCray was sitting in the front passenger's seat of that car; Orlando Scott was sitting in the back seat on the passenger's side; and both men participated in Chaney's murder, with one pulling the trigger and the other providing assistance.  A Michigan state jury convicted both McCray and Scott of second-degree murder and use of a firearm during the commission of a felony.  McCray petitioned for a writ of habeas corpus and now appeals the district court's denial of his petition.

-1-

No. 05-1902
McCray v. Metrish

McCray's strongest claim is that the admission into evidence of an out-of-court statement by Scott violated his Sixth Amendment right to confront the witnesses against him. We agree that a constitutional violation occurred. Applying the deferential standard of review mandated by the Antiterrorism and Effective Death Penalty Act, however, we have no basis to disturb the state court's conclusion that the error was harmless.

We can dispose of McCray's other three claims more easily. First, he waived his claim that the admission of his allegedly involuntary confession violated the Fifth Amendment's protection against self-incrimination: the section of his appellate brief purportedly addressing that claim in fact discusses a distinct Fourth Amendment claim on which no certificate of appealability was issued. Second, his claim that he received ineffective assistance of trial counsel is procedurally defaulted: our precedent compels us to conclude that the state appellate courts rejected this claim without reaching the substance because McCray did not comply with a state procedural rule. Third, his claim that he received ineffective assistance of appellate counsel lacks merit: because he claims that his counsel ineffectively advanced a Fourth Amendment claim, he must show that the underlying claim was meritorious, and he cannot do so.

I

Scott gave a statement regarding Chaney's shooting prior to trial. The jury heard a redacted version of that statement: all names except Scott's were replaced by the word "blank." In the statement, Scott told police that he went to Philip Street looking for people who had robbed a friend's dope house; that he and three other people were in a green Acura sedan that stopped in front of 864 Philip Street, with a fifth person somewhere behind them in a second car; and that he was

–2–

sitting in the back seat on the passenger's side. Someone in the Acura, believing that Chaney was the robber, called Chaney over to the car. The person in the front passenger's seat removed two guns, a nine-millimeter and a .380, from the glove compartment and attempted to hand the nine-millimeter to Scott, but Scott did not take it. That person then fired four or five shots at Chaney as Chaney was running away.

The trial court instructed the jury to consider the statement only as evidence against Scott. And although Scott denied responsibility, one could understand his statement to be self-incriminating. Some evidence suggested that the shooter was in the back seat on the passenger's side, and Scott admitted that he was the one sitting there. But one also could understand Scott's statement to inculpate McCray, since other evidence indicated that McCray was the "blank" sitting in the front passenger's seat. Scott did not testify at trial, leaving McCray with no opportunity to cross-examine him about the statement.

The warden concedes that, despite the redaction and the limiting instruction to the jury, the trial court's treatment of Scott's statement violated the constitutional rule that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const., amend. VI; *see generally Bruton v. United States*, 391 U.S. 123, 136 (1968) (holding that the admission of statements by a non-testifying co-defendant can violate the Sixth Amendment even when the jury receives a limiting instruction). The warden argues, however, that the violation was harmless error. *See Schneble v. Florida*, 405 U.S. 427, 432 (1972) (holding that a violation of *Bruton* does not require automatic reversal).

A

To determine whether the error was harmless, we first must identify the appropriate standard of review. Our approach to a harmless-error question on collateral review depends on whether a state court addressed the merits of that question on direct review. AEDPA permits us to grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" only if the state decision "was contrary to, or an involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The federal rule governing harmless-error determinations on direct review is that an error must be "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). When a state court determined that an error occurred but was harmless, "the appropriate standard of review is the *Chapman* standard plus AEDPA deference." *Eddleman v. McKee*, 471 F.3d 576, 585 (6th Cir. 2006).

Section 2254(d) applies, however, only when there is a state decision to which we can defer. If the state court did not address whether an error was harmless (*e.g.*, if it found no error in the first place), then we cannot apply AEDPA deference. In that situation, we apply the pre-AEDPA standard articulated by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), asking whether an error had a "substantial and injurious influence in determining the jury's verdict."

Here, we believe that the Michigan Court of Appeals did address the merits of the harmless-error question. After determining that it could not resolve a Fourth Amendment challenge to the admissibility of McCray's confession without a more developed factual record, that court disposed of McCray's Sixth Amendment claim in a single phrase: "if on remand, the trial court determines that defendant McCray's inculpatory statement must be suppressed, then it was also reversible error

to admit defendant Scott's redacted statement." Despite its brevity, that phrase has a clear meaning. It indicates that the admission into evidence of Scott's redacted statement was error, but that the error was harmless as long as McCray's confession was properly admitted. On remand, the state courts concluded that there was no error relating to the confession.

State conclusions of law deserve AEDPA deference regardless of how those conclusions are expressed. *See Harris v. Stovall*, 212 F.3d 940, 943 n.1 (6th Cir. 2000) ("Where a state court decides a constitutional issue by form order or without extended discussion, a habeas court should then focus on the result of the state court's decision, applying the standard articulated above."). Consequently, we believe that the proper standard of review in this case is the standard articulated in *Eddleman*.

B

Applying that standard, we now ask whether that decision "was contrary to, or an unreasonable application of, the clearly established federal rule that a trial error is harmless only if it is harmless beyond a reasonable doubt." *Eddleman*, 471 F.3d at 578. That inquiry, like any harmless-error inquiry, is highly fact-specific, and it requires us to describe the state's case against McCray in some detail.

In addition to Scott's statement, the jury heard three types of evidence: McCray's own statements to police, including a full confession; the eyewitness accounts of six bystanders and two other occupants of McCray's Acura; and forensic evidence. Some of the eyewitness accounts and forensic evidence corroborated elements of McCray's confession, but none of it, standing alone, inculpated McCray. In other words, the state's case against McCray depended on McCray's confession.

McCray made three statements to police. In all three statements, he admitted that he and at least four other people – his cousin Oyd McCray, Scott, Devon Jackson, and Jeff Johnson – went to Philip Street to investigate a robbery at Jackson's dope house and that he was in the green Acura in front of 864 Philip Street when the shooting took place. In his first statement, he indicated that he was in the front passenger's seat of the Acura, with Scott directly behind him in the back seat. Jackson drove a second car and stopped some distance behind the Acura. Chaney approached the Acura and briefly argued with Scott; as Chaney started to move away, Jackson fired four or five shots, apparently because he thought Chaney was reaching for a gun. In fact, Chaney was unarmed, and neither McCray nor Scott asked for a jury instruction addressing the possibility that the shooting was in self-defense.

In his second statement, McCray again named Jackson as the shooter. This time, however, he said that he was driving the Acura (not sitting in the front passenger's seat) and that Jackson was in the back seat of the Acura on the passenger's side (not in a second car).

In his third statement, McCray confessed that he was the shooter. As in the first statement, he said that he was in the front passenger's seat of the Acura, with Scott directly behind him. As in the first statement, he said that Jackson followed in a second car. Unlike in the first statement, however, he stated that *he* was the one who had taken a rusty .380 out of the glove compartment and fired four or five shots at Chaney as Chaney moved away from the car.

The accounts of the six bystanders generally corroborate McCray's confession. All six agreed that the bullets came from the passenger's side of a green or gray car stopped in front of 864 Philip Street and that there were four people in the car. The witnesses disagreed, however, about

where the shots came from. Anthony Cannon testified that the shots came from the front passenger's seat. Kimberly Wilson testified that they came from the passenger's side of the back seat, stating further that she saw a "skinny arm" reach out and fire the shots; that physical description is consistent with Scott's build but not McCray's. Jeffrey Cannon echoed Wilson's testimony at trial, but before trial he had told police that he saw gunfire from both the front and back seats on the passenger's side. He explained the inconsistency by stating that he was afraid when he gave his pre-trial statement because he was in police custody at the time. None of the other bystanders could tell whether the shots came from the front or back of the car.

Jeffrey Cannon was the only bystander who could identify any of the people in the car, and he gave more detailed testimony than the other bystanders gave. He testified that he had seen McCray's car about fifteen minutes before the shooting and that at the time McCray was driving. He said that he did not know whether McCray was still in the driver's seat when the car stopped in front of 864 Philip Street, but he professed confidence that Scott was the shooter.

The jury also heard the accounts of two people who were in the car with McCray and Scott. It was stipulated that Oyd McCray would have testified that Oyd – not Kelvin McCray – was driving the car, that Scott was sitting in the back passenger's seat, and that "he didn't fire any shots." (It is unclear whether "he" refers to Oyd or Scott.) Testifying for the defense, Jeffrey Johnson stated that he was in the back seat on the driver's side of the green Acura with McCray driving, Oyd in the front passenger's seat, and Scott in the back seat on the passenger's side. He stated that no one in the Acura had a weapon and that the shots came from somewhere behind the Acura, possibly from inside another car.

Finally, the jury heard three relevant stipulations regarding forensic evidence. First, police recovered five spent casings in front of 864 Philip Street and one bullet that hit Chaney. Second, those casings were found near where McCray's car had stopped, not where a second car following McCray's car might have stopped. Third, all of the casings came from the same .380-caliber gun, and police had not recovered the gun.

Against this evidence, McCray argued at trial that his first statement, in which he said that Jackson shot Chaney from a second car, was the truth. His second and third statements, he claimed, were falsehoods that he invented because he believed that he would not be released until he told police what they wanted to hear.

C

Set against these facts, was the state-court decision – that the admission of Scott's statement was harmless beyond a reasonable doubt – an unreasonable application of clearly established federal law? To answer that question, we must assume the uncomfortable position of surrogate jurors, critically evaluating the evidence presented at trial. We review that evidence in two steps. First, we "consider the evidence before the jury absent the constitutionally infirm evidence," determining the strength of the case that the jury should have seen. *Brumley v. Wingard*, 269 F.3d 629, 646 (6th Cir. 2001). Second, we examine the persuasiveness of the erroneously admitted evidence, considering the nature of the evidence, the emphasis placed on it within the state's case, its relationship to the other evidence presented, and whether there was opportunity to challenge it through cross-examination. *Eddleman*, 471 F.3d at 586 (citing *Arizona v. Fulminante*, 499 U.S. 279, 296-302 (1991)). As the persuasiveness of the erroneously admitted evidence increases, the strength required

in the state's untainted case to render the error harmless increases as well. When the state's case is extremely weak, almost no error will be harmless. When its case is overwhelmingly strong, even a very large error might be harmless.

Regarding the state's case, as noted earlier, the forensic evidence and some of the eyewitnesses accounts corroborated elements of McCray's third statement, but no evidence other than the third statement independently inculpated McCray. Thus, *without the third statement*, the state's case against McCray would have been very weak. But the third statement is quite powerful. "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Fulminante*, 499 U.S. at 296 (quotation marks and citations omitted). This is especially true when the confession includes details about the crime – the goal of finding the robber of Jackson's dope house, the number of shots fired, the caliber of the gun, that Chaney was moving away from the car when he was shot – rather than merely a bare assertion of guilt. *See ibid*. (describing a qualitative distinction between a circumstantially inculpatory statement and "a full confession in which the defendant discloses the motive for and means of the crime"). Based on the confession alone, we think that without Scott's statement the case against McCray was at least moderately strong.

Regarding the erroneously admitted evidence, there are three reasons to think that Scott's statement was not particularly persuasive as evidence against McCray. First, the trial court explicitly instructed the jury that it should consider the statement only as evidence against Scott. We generally presume that juries follow such limiting instructions. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987). Even when the danger that a jury might not heed the instruction is sufficient for us to say

that the instruction does not *eliminate* the error, as here, it greatly reduces the *harm attendant* to the error. *See United States v. Lane*, 474 U.S. 438, 450 (1986) (holding that a misjoinder was harmless when "the District Court provided a proper limiting instruction, and in the final charge repeated that instruction and admonished the jury to consider each count and defendant separately").

Second, the statement that the jury heard named a "blank" as the shooter, not McCray. While the jury might have surmised that the blank referred to McCray, if for no other reason than because the state had charged him with Chaney's murder, it could not have had perfect confidence that its supposition was correct. Like the limiting instruction, the redaction probably reduced the statement's impact on the jury even though it was not enough to make the admission of Scott's statement constitutionally permissible.

Third, a self-serving statement lacks the persuasive force of testimony by a disinterested witness. *Eddleman*, 474 F.3d at 587 (concluding that an error was not harmless when much of the properly admitted inculpatory testimony came from witnesses who "had reasons to implicate Eddleman other than a commitment to telling the truth"). Here, the properly admitted evidence, especially the confession, was not thus discountable, while Scott's statement was plainly self-serving, and for that reason the jury may well have viewed it skeptically.

McCray argues that our view of Scott's statement understates its likely influence on the jury. Because Scott's account of the shooting closely paralleled McCray's third statement, McCray claims, the admission of Scott's statement undercut his position that his third statement was a false confession. The problem with this argument is that McCray's false-confession theory would have seemed incredible no matter what. As noted earlier, McCray at trial took the position that he told

the truth in his first statement, in which he said that Jackson shot Chaney from a second car. This position is flatly inconsistent with the location of the shell casings, close to where McCray's car was stopped, and with the testimony of the six bystanders, all of whom agreed that the shots came from the passenger's side of McCray's car. Only Johnson, another occupant of McCray's car, gave testimony that was compatible with McCray's core position; even the testimony of Jeff Cannon and Kimberly Wilson, who identified Scott rather than McCray as the shooter, contradicts it. Consequently, the jury likely disbelieved McCray's theory because it went against the overwhelming weight of the properly-admitted evidence, not because Scott's statement reinforced McCray's confession.

Nevertheless, we do not think that this is an easy case. *Chapman*'s requirement that an error must be harmless beyond a reasonable doubt is a high bar to findings of harmlessness on direct review. Applying the *Chapman* standard in two cases somewhat similar to McCray's case, the Supreme Court reached opposing results. In *Schneble v. Florida*, the Court held that an error was harmless. 405 U.S. at 432. Many of the facts in *Schneble* parallel the facts of McCray's case: the defendant confessed to strangling a woman with a rope, but argued that his confession was false; his co-defendant made an out-of-court statement that echoed the defendant's confession; the trial court instructed the jury not to consider the co-defendant's statement against the defendant, but the Supreme Court held that it was error to admit it at all. *Id.* at 429. But in *Schneble*, unlike in this case, a key piece of physical evidence supported the defendant's confession: shortly after the murder, Schneble had rope burns on his hands. *Id.* at 431.

Conversely, in *Arizona v. Fulminante*, the Court held that the erroneous admission of a coerced confession was not harmless under the *Chapman* standard. 499 U.S. at 302. Somewhat like in this case, the only other significant evidence against the defendant was a second, untainted confession, and the defendant challenged the reliability of that confession. *Id.* at 296. The Court's analysis, however, relied heavily on the fact that the erroneously admitted evidence was a confession, noting that "the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless." *Ibid.* The evidence erroneously admitted here – Scott's statement – would not have had such a profound impact on McCray's jury.

This case falls somewhere between *Schneble*, where the state's case was stronger, and *Fulminante*, where the erroneously admitted evidence was more persuasive. Were it before us on direct review, we might well have conclude that the lack of physical evidence inculpating McCray distinguishes this case from *Schneble* and therefore that the admission of Scott's statement was not harmless. But it is not before us on direct review. Our charge is *not* to ask whether the error was harmless beyond a reasonable doubt (the *Chapman* standard applicable on direct review) but rather whether it was *unreasonable* for the state court to conclude that it was harmless. Precisely because the underlying question is close, we cannot say that the state decision was unreasonable. *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous.").

II

McCray also raises three claims regarding the admissibility of his confession. After summarizing the circumstances of McCray's initial arrest and detention, we address those claims in turn. It is clear that none provides a basis to grant McCray's petition.

A

Police first learned that McCray was involved in Chaney's murder from Jeffrey Cannon. While himself in police custody, Cannon said that Chaney was shot by someone in a gray Toyota four-door car with "gold star type wheels" and "gold trim around the wheel wells." Other eyewitness had described the car as a green Acura with star wheels. Cannon said that a man whom he knew as "Head" owned the car and provided the addresses of three residences where he thought that police might find Head. He described Head as a black male in his early 20s, about 5' 9", with a heavy build, dark complexion, bald head, and thin mustache.

At one of these addresses, police officers saw a dark-green four-door Acura with star wheel covers. They waited until McCray walked out of the residence, ascertained that the Acura was his, and arrested him, explaining that he matched the description of Head. The description of McCray contained in an officer's interrogation record made later that day, however, differs somewhat from Cannon's description of Head. It describes McCray as a 21-year-old black man with dark complexion, matching the description, but also lists his height as only 5' 6" and states that he had a medium build, short hair, and no mustache.

McCray was arraigned three days after his arrest. In the interim period, he made the three statements introduced at trial. The detective who questioned McCray explained the delay by stating that "[t]he case was an active case, we were following people, we were following up trying to locate other people, talking to them."

Before trial, according to McCray, his trial counsel filed a motion to suppress his confession, but then withdrew the motion before the trial court could hold a hearing or rule on it. On direct appeal, McCray raised two challenges to the confession's admissibility. First, he claimed that his detention was unreasonable because he was arrested without probable cause and held for three days prior to arraignment, in violation of the Fourth Amendment, and that his confession was an inadmissible fruit of the unlawful detention. Second, he claimed that his confession was involuntary and therefore that its admission into evidence violated the Fifth Amendment's protection against self-incrimination. The Michigan Court of Appeals remanded the case to the trial court for an evidentiary hearing regarding the Fourth Amendment claim. On remand, the trial court found that McCray's arrest was supported by probable cause and that police did not unreasonably delay McCray's arraignment in order to extract incriminating evidence. That finding was affirmed on appeal.

Later, McCray returned to the state trial court to file a motion for relief from the judgment, arguing that he received ineffective assistance of trial and appellate counsel in challenging the admissibility of his confession on direct review. The court held that the actions and omissions alleged by McCray "do not constitute such prejudicial and egregious errors to warrant relief" and denied the motion. The Michigan Court of Appeals and the Michigan Supreme Court each denied

his application for leave to appeal for failure to meet the burden of establishing entitlement to relief under Michigan Court Rule 6.508(D).

In his petition for a writ of habeas corpus, McCray reprises his Fourth Amendment claim, his Fifth Amendment claim, and his two ineffective-assistance claims.

B

We cannot reach the merits of either the Fourth Amendment claim or the Fifth Amendment claim. In his appellate brief, McCray includes a section heading regarding the Fifth Amendment claim, but the discussion that follows that heading is not about the Fifth Amendment. Instead, apparently due to a mistake by his attorney, it is about *the Fourth Amendment claim*. The principle that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" precludes us from addressing the substance of the Fifth Amendment claim. *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) (internal quotation marks and citations omitted).

Nor can we address the substance of the accidentally-briefed Fourth Amendment claim. Both the district court and this court refused to grant a certificate of appealability with respect to that claim. AEDPA states that, "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals." 28 U.S.C. § 2253(c)(1)(A). Because no certificate was issued here, the statute's plain language prohibits us from addressing the Fourth Amendment claim.

C

We also do not need to reach the merits of McCray's ineffective-assistance-of-trial-counsel claim. "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977)). Our precedent compels us to conclude that the state courts relied on an "adequate and independent state procedural bar" to reject McCray's claim regarding the ineffectiveness of trial counsel on a state procedural ground and therefore that the claim is procedurally defaulted. *Luberda v. Tripett*, 211 F.3d 1004, 1005 (6th Cir. 2000).

As noted earlier, McCray raised his ineffective-assistance claims in a motion for relief from the judgment rather than on direct appeal. After the trial court addressed and rejected those claims on the merits, the state appellate courts refused to review McCray's claim. They stated in one-sentence orders that he had "failed to meet the burden of establishing entitlement to relief under [Michigan Court Rule] 6.508(D)." The relevant part of Rule 6.508(D) bars courts from granting a motion for relief from the judgment that "alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion." M.C.R. 6.508(D)(3).

We have confronted essentially the same facts before. In *Luberda*, the petitioner filed a motion for relief from the judgment raising four constitutional claims that he had not raised in his initial appeal, including a claim of ineffective assistance of trial counsel. 211 F.3d at 1006. After the trial court rejected his motion on the merits, the Michigan Court of Appeals and the Michigan

No. 05-1902
McCray v. Metrish

Supreme Court affirmed, ruling that '[Luberda had] failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D).'" *Ibid.* (alteration in original). We held that his claims were procedurally defaulted. The state supreme court, we reasoned, was the last state court to issue a reasoned (albeit brief) decision in Luberda's case, and by invoking Rule 6.508(D) it made clear that its decision to deny relief rested exclusively on a state procedural rule. *Id.* at 1005.

We see no relevant distinction between this case and *Luberda*. Following our binding precedent, we hold that McCray's claim is procedurally defaulted.[1]

We may excuse a petitioner's default, and address an otherwise-defaulted claim on the merits, only if we conclude that "there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the

---

[1]McCray contends that his case is controlled by *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), rather than by *Luberda*. In *Abela*, we held that a claim was not procedurally defaulted when the state trial court and the state court of appeals both addressed it on the merits but the Michigan Supreme Court invoked Rule 6.508(D) in denying review. *Abela* does not compel us to reach the same result here, because the relevant procedural facts are not the same. In McCray's case, *Luberda*, and *Abela*, the Michigan Supreme Court relied on Rule 6.508(D) to deny review of a claim. However, in McCray's case and *Luberda* – but not in *Abela* – the state court of appeals also relied on Rule 6.508(D), "making it clearer that the Michigan Supreme Court was also invoking [a procedural] bar when it referred to M.C.R. 6.508(D)." *Abela*, 380 F.3d at 923.

Moreover, because "en banc consideration is required to overrule a published opinion of the court," 6th Cir. R. 206(c), *Abela* could not have overruled *Luberda* and our subsequent opinions following *Luberda*. *See Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Munson v. Kapture*, 384 F.3d 310, 314-15 (6th Cir. 2004); *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 387 (6th Cir. 2004); *Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002); *Simpson v. Jones*, 239 F.3d 399, 407 (6th Cir. 2000). *Luberda* remains binding precedent; its facts are on all fours with the facts of McCray's case; and it compels us to conclude that McCray's ineffective-assistance-of-trial-counsel claim is procedurally defaulted.

–17–

petitioner's case." *Coleman v. Thompson*, 501 U.S. 722, 749 (1991). But we do not believe that McCray satisfies these conditions.

First, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Ineffective assistance of appellate counsel, however, can constitute cause for failure to raise a claim of ineffective assistance of trial counsel in a timely fashion. *Id.* at 496. McCray, for the first time on appeal, claims that any procedural default was caused by ineffective appellate assistance. He argues that his appellate counsel knew both that he wanted to pursue an ineffective-assistance claim and that his trial counsel had withdrawn as appellate counsel so that he could raise the issue on direct appeal. Yet "[h]abeas petitioners cannot rely on conclusory allegations of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced." *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). McCray's allegations in support of his ineffective-assistance-as-cause theory – all made in a single sentence of his appellate brief – are both conclusory and unsupported by evidence.

Second, to establish prejudice, a petitioner advancing an ineffective-assistance claim must make the same showing that he would have been required to make to establish that the ineffective assistance itself was prejudicial. *Joseph v. Coyle*, 469 F.3d 441, 462-63 (6th Cir. 2006). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Here, there is *no* chance that the outcome would have been different if McCray's

trial counsel had not withdrawn the motion to suppress. On direct appeal, the Michigan Court of Appeals ordered the trial court to conduct an evidentiary hearing. That evidentiary hearing probed the exact questions that the withdrawn motion to suppress would have raised. After the hearing, the trial court concluded that McCray's initial arrest was supported by probable cause and that his confession was voluntary. Whether or not those holdings are correct, there is no reason to think that the result would have been different had the trial court addressed them in a different procedural setting. *Cf. Van v. Jones*, 472 F.3d 292, 314 (6th Cir. 2007) (holding that a Michigan consolidation hearing is not a "critical stage" because "counsel could have cured the potential harm arising from his absence by making a motion to sever later in the proceeding against his client").

Third, "[a] fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren*, 440 F.3d at 764 (quoting *Murray*, 477 U.S. at 496). McCray does not attempt to show that he is actually innocent. Nor could he, given his confession, Scott's inculpatory statement, and the other evidence.

Because McCray can show neither cause or prejudice, nor that failure to consider his ineffective-assistance claim would result in a miscarriage of justice, we cannot excuse his procedural default.

D

Finally, McCray argues that his appellate counsel provided constitutionally ineffective assistance at the evidentiary hearing before the trial court after the remand ordered by the state court of appeals. He posits that his Fourth Amendment claim that his arrest was not supported by probable cause would have succeeded had his appellate counsel introduced evidence that McCray did not

–19–

match the physical description of Head given by Jeffrey Cannon. Although we do reach the merits of this claim, we conclude that the district court was correct to deny relief.

To prevail on his ineffective-assistance claim, McCray must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Strickland*, 466 U.S. at 687. McCray cannot show prejudice. "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove [1] that his Fourth Amendment claim is meritorious and [2] that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). McCray can satisfy the second requirement: had the confession been excluded, the state would have had little evidence of McCray's guilt, and there would have been a reasonable probability (if not a certainty) that he would not have been convicted.

But he cannot satisfy the first requirement. "The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony . . . ." *Carroll v. United States*, 267 U.S. 132, 156 (1925). The Court "has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant." *Gerstein v. Pugh*, 420 U.S. 103, 113 (1975). To determine whether probable cause existed, we ask whether at the time of the arrest an officer knows of facts and circumstances "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Despite the discrepancies between Cannon's description of Head and the arresting officer's description of McCray, the police had probable cause to arrest McCray. Cannon provided officers with three addresses at which they might find Head, including the address of the house outside of which McCray was arrested. Cannon stated that Head was driving a gray Toyota four-door car with "gold star type wheels" and "gold trim around the wheel wells." Other eyewitness had described the car as a green Acura with star wheels. Officers knew from a police database that McCray owned a green Acura. They saw a green Acura with star wheels and gold trim parked outside the house where he was arrested. They waited until McCray walked out of the residence, ascertained that the Acura was his, and arrested him. This information alone, without any reference to whether McCray's appearance matched Cannon's description of Head, is sufficient to establish probable cause. In particular, the fact that officers found the Acura parked outside a house specifically identified by Cannon makes it reasonable for officers to believe that McCray was the suspect whom they sought.

Moreover, the discrepancies between the two descriptions are not as serious as they appear. First, Cannon described Head as having a heavy build, while McCray's interrogating report described him as having a medium build. Yet the interrogation report listed McCray's height as 5'6" and his weight as 165 pounds. Based on those numbers, it seems possible that an observer reasonably could have described McCray's build as either medium or heavy – such that an officer looking for a heavy person would not automatically conclude that McCray was not his man.[2] Second, Cannon described Head as having no hair and a light mustache, while the interrogation report described him as having

---

[2]Indeed, at trial, McCray's counsel responded to Kimberly Wilson's testimony that the shooter had a skinny arm by stating that "I didn't hear anyone refer to [McCray] as being a man with skinny arms" – suggesting that McCray's build probably was closer to "heavy" than "thin."

short hair and no mustache. That disparity, however, could result from little more than a few days of shaving and not getting a haircut. Third, Cannon described Head as 5'6", while the interrogation report listed his height as 5'9". While this three-inch difference is significant, both 5'6" and 5'9" fall within the range of approximately average male heights. Given all of these facts, the diverging descriptions may well have resulted primarily from the difficulty of translating a full description of a person's appearance into a series of single adjectives transcribed onto a form. This is especially likely because Cannon knew Head well and readily identified McCray as Head at trial.

Based on these circumstances, it is clear that McCray's arrest was supported by probable cause. A person of reasonable caution easily could have believed that McCray had committed an offense. *Beck*, 379 U.S. at 95.

In dismissing McCray's motion for relief from the judgment, the state trial court concluded that McCray's claim of ineffective assistance of appellate counsel had no merit. That decision was not contrary to, or an unreasonable application of, clearly established law. Because McCray's Fourth Amendment claim that his arrest was not supported by probable cause is not meritorious, he cannot prevail on his ineffective-assistance claim.

### III

The judgment of the district court denying McCray's petition is affirmed.

No. 05-1902
McCray v. Metrish

**JULIA SMITH GIBBONS, Circuit Judge, concurring.** I concur with the majority's decision to deny the petition and its resolution of all issues in the case; however, I would not apply the AEDPA standard of review to the issue involving Scott's statement because I believe that the Michigan courts did not adjudicate the harmlessness of the admission of Scott's statement on the merits.

The only state court to mention the admissibility of Scott's statement was the Michigan Court of Appeals, prior to remanding the case for factual development of McCray's claim that his confession should be suppressed. The entirety of its consideration of the issue was: "if on remand, the trial court determines that defendant McCray's inculpatory statement must be suppressed, then it was also reversible error to admit defendant Scott's redacted statement." The majority reads this comment of the Michigan Court of Appeals to mean that the admission of Scott's statement was harmless if McCray's statement was properly admitted. (Op. 4-5.) I disagree that the comment can be read in this way. The only conclusion that may be drawn from the Michigan Court of Appeals's statement is that if McCray's statement was *not* admissible then the admission of Scott's statement was *not* harmless. It does not logically follow that the reverse of each proposition is true.[3] It seems equally likely that the Michigan court intended to express the view that if the confession were suppressed, the admission of Scott's statement was clearly reversible error, but that it was reserving judgment on the issue in the event that the confession was not suppressed. Therefore, given the

---

[3]For example, if a case is not from the Sixth Circuit, then it is not from the Eastern District of Michigan. It does not follow that if a case is from the Sixth Circuit, then it is from the Eastern District of Michigan.

absence of any other indication to the contrary, I would conclude that the Michigan courts did not adjudicate the harmlessness of the admission of Scott's statement.

In the absence of a state court decision on the merits, the pre-AEDPA standard of review applies, and as the majority notes, we ask whether the error had a "substantial and injurious influence in determining the jury's verdict," with the petitioner having the burden of demonstrating the trial error resulted in "actual prejudice." *Brecht*, 507 U.S. at 637. Because McCray cannot satisfy this standard, which is arguably more deferential than the AEDPA standard, *see Eddleman*, 471 F.3d at 582-83, I concur in the denial of the petition.